Sarah GORIN, Bern Hinckley, Chelsea R. Kesselheim, John M. Faunce, Linda Kirkbride, Jesse Guidry, Verna Crusch, Ernest A. Roybal, Chris Plant, Wayne E. Morrow, Larry W. McGonigal, and Teri J. Royer, Plaintiffs,

Harriett Elizabeth "Liz" Byrd, Edith V. Garcia, Pat Hacker, Fred Harrison, Shirley J. Humphrey, Patrick F. O'Toole, Scott J. Ratliff, Bill Vasey, and Carol Watson, Intervening Plaintiffs,

v.

Kathy KARPAN, Wyoming Secretary of State in her individual official capacity and as a member of the State Canvassing Board, Michael J. Sullivan, Governor of the State of Wyoming in his individual official capacity and as a member of the State Canvassing Board; David Ferrari, Wyoming State Auditor in his individual official capacity and as a member of the State Canvassing Board, and Stan Smith, Wyoming State Treasurer in his individual official capacity and as a member of the State Canvassing Board, Defendants.

No. 91–CV–0054–K.

United States District Court, D. Wyoming.

Oct. 15, 1991.

Ford T. Bussart of Greenhalgh, Bussart, West & Rosetti, P.C., Rock Springs, Wyo., Lisa A. Botham, Green River, Wyo., for intervening plaintiffs.

Mark Braden and Marc D. Flink of Baker & Hostetler, Denver, Colo. (Joseph B. Meyer, Wyo. Atty. Gen., Clinton D. Beaver, Wyo. Senior Asst. Atty. Gen., Thomas B. Evans of Baker & Hostetler, Denver, Colo., with them on the briefs), for defendants.

Peter C. Maxfield, Laramie, Wyo., on the brief for amicus curiae Wyoming Democratic Party.

Before BRORBY, Circuit Judge, BRIMMER, Chief District Judge, and JOHNSON, District Judge.

BRORBY, Circuit Judge.

## I. INTRODUCTION

This case raises an equal protection challenge, based upon the Fourteenth Amendment of the United States Constitution and provisions in the Wyoming Constitution, to the validity of Wyoming's 1991 Legislative Reapportionment Act.[1]

Plaintiffs Sarah Gorin, Bern Hinckley, Chelsea R. Kesselheim, John M. Faunce, Linda Kirkbride, Jesse Guidry, Verna Crusch, Ernest A. Roybal, Chris Plant, Wayne E. Morrow, Larry W. McGonigal, and Teri J. Royer are citizens, taxpayers and qualified voters of Wyoming. Plaintiff Intervenors (Intervenors) are duly elected, qualified and serving members of the Fifty–First Legislature of the State of Wyoming.

Defendants Michael J. Sullivan, Kathy Karpan, David Ferrari and Stan Smith are the Governor, Secretary of State, State Auditor, and State Treasurer, respectively. Defendants collectively constitute the State Canvassing Board with the authority to certify the official state canvass.[2]

Plaintiffs and Intervenors are united in their contention that the 1991 Reapportion-

Steven F. Freudenthal of Herschler, Freudenthal, Salzburg, Bonds & Rideout, P.C., Cheyenne, Wyo. (Hardy H. Tate, Sheridan, Wyo., William John Disney, Douglas, Wyo., with him on the briefs), for plaintiffs.

---

1. Original House Bill 259, Enrolled Act No. 81, House of Representatives of the Fifty–First Legislature of the State of Wyoming (1991 General Session) was adopted by the Wyoming House of Representatives and Wyoming Senate and allowed to become effective without the Governor's signature on February 28, 1991.

2. *See* Wyo.Stat. §§ 22–16–114, –117 (1977).

ment Act (Act) violates equal protection by creating intolerable population inequalities among election districts in election of members of both the Wyoming House of Representatives and the Wyoming Senate. Likewise, both Plaintiffs and Intervenors assert that Article III, § 3 of the Wyoming Constitution is unconstitutional insofar as it mandates that each county shall constitute a senatorial and representative district.[3] Their positions differ, however, with respect to the constitutionality of multi-member districts. Plaintiffs contend that Wyoming's multi-member districts are unconstitutionally denied political equality with single-member districts in the State. In contrast, Intervenors assert that reapportionment of the Wyoming legislature can provide for multi-member districts in some areas while at the same time securing equal protection of voting rights to all state citizens.

Defendants contend the Act provides for fair and effective representation, and is therefore in compliance with both the United States Constitution and the Wyoming Constitution. Defendants further contend the population deviations inherent in the Act are justified by significant and reasonable state interests.

This court is therefore called upon to determine the permissible range of deviation from voter equality under the Fourteenth Amendment as applied to circumstances in Wyoming. Jurisdiction is based upon 28 U.S.C. § 1343(a)(3)–(4) and 28 U.S.C. §§ 2201–2202. A three-judge court was designated pursuant to 28 U.S.C. § 2284, which provides that "[a] district court of three judges shall be convened when ... an action is filed challenging the constitutionality of ... the apportionment of any statewide legislative body."

## II.  BACKGROUND

Geographically, Wyoming may have been best characterized by former Governor and United States Senator Milward L. Simpson when he said: "Wyoming is a land of high altitudes and low multitudes." Straddling the continental divide, Wyoming's population typically congregates in small, hospitable towns bearing such distinctive western names as Buffalo, Cheyenne, Laramie, Sundance, and Ten Sleep. Scattered among the miles separating Wyoming's towns and cities are ranchers and mineral extractors. A total state population of 453,588 is dispersed over 97,914 square miles.

Since Wyoming became a state in 1890, the number of Wyoming counties has increased from thirteen to twenty-three. County boundaries last changed in 1921 with the addition of Teton and Sublette counties. Sweetwater, the largest of Wyoming's counties, contains 10,475 square miles, while Hot Springs, the smallest county, contains 2,022 square miles. With few exceptions, the population of towns and cities within those counties has increased over the years, while the number of citizens residing in unincorporated areas of Wyoming has decreased.

The Wyoming Constitution unequivocally commands the state legislature to reapportion every ten years based upon the most recent United States census data.[4] The state constitution also provides for a bicameral legislature with each county constituting a senatorial and representative district, and each county having at least one senator and one representative.[5] Although the federal courts declared the provision requiring one senator from each county to be violative of Fourteenth Amendment equal protection,[6] the Wyoming legislature has continued to provide each county with at least one representative regardless of how small the county population may be. As a

---

3. This provision as applied to reapportionment in the state Senate was held unconstitutional in *Schaefer v. Thomson*, 240 F.Supp. 247 (D.Wyo. 1964), *supplemental*, 251 F.Supp. 450 (D.Wyo. 1965), *aff'd per curiam sub nom. Harrison v. Schaefer*, 383 U.S. 269, 86 S.Ct. 929, 15 L.Ed.2d 750 (1966).

4. Wyo. Const. art. III, § 48.

5. Wyo. Const. art. III, § 3. In addition, this provision mandates that "at no time shall the number of members of the house of representatives be less than twice nor greater than three times the number of members of the senate."

6. *Schaefer v. Thomson*.

result, the citizens in Wyoming's more populous counties have historically been underrepresented in the state legislature, and those citizens in Wyoming's less populous counties have been overrepresented. In other words, the less populous counties have more than their fair share of legislative voting power. This is the root of the problem now before this court.

As indicated, this problem is not new. Wyoming citizens have challenged the constitutionality of the state's reapportionment legislation on three prior occasions. In 1963, the Wyoming legislature reapportioned the state by allocating at least one Senate seat and one House seat to each county in accordance with the mandate of the Wyoming Constitution. The plan resulted in a maximum deviation range of 205% in the Senate and 90% in the House. Plaintiffs, as citizens and voters, challenged this plan on equal protection grounds. Another citizen group intervened to persuade the court to redistrict the state into single-member districts. *Schaefer v. Thomson.*

A three-judge panel declared the Senate plan unconstitutional, but upheld the House plan. *Id.* at 251–52. The court withheld immediate affirmative judicial relief in order to permit the legislature to reconsider reapportionment of its Senate and to enact a valid law. However, the court exercised its retained jurisdiction after the legislature failed to enact another plan within the prescribed time.

The court reapportioned the Wyoming Senate into seventeen multi-member senatorial districts, combining contiguous counties only when necessary to satisfy the "one person, one vote" principle. *Schaefer v. Thomson,* 251 F.Supp. at 452. The court's plan reduced the maximum population deviation in the Senate from 205% to 71%. Only the intervenors appealed. The United States Supreme Court affirmed in a *per curiam* decision without opinion. *Harrison v. Schaefer.*

Wyoming citizens also challenged the 1971 Legislative Apportionment Act. This legislation was upheld in its entirety because the 1971 Act merely reflected popula-tion fluctuations and did not substantially alter either the previously approved 1963 House plan, or the court's 1965 Senate plan. *Thompson v. Thomson,* 344 F.Supp. 1378, 1380–81 (D.Wyo.1972). This decision was not appealed.

Voters again challenged the reapportionment of the Wyoming House of Representatives after the legislature enacted the 1981 Legislative Apportionment Act. This challenge, however, was a narrow one, pertaining to a single county. In *Brown v. Thomson,* 536 F.Supp. 780 (D.Wyo.1982), *aff'd,* 462 U.S. 835, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983), plaintiffs urged the court to find only that the allocation of a representative to Niobrara County, the state's least populated county, violated equal protection principles. The three-judge court dismissed the plaintiffs' complaint, finding the allocation of a representative to Niobrara County statistically insignificant where it only increased the total number of seats in the House from sixty-three to sixty-four. Because the dilution of the plaintiffs' vote was *de minimis,* plaintiffs failed to meet their burden of proving invidious discrimination. The district court also noted that the long-standing policy of maintaining county boundaries was rational. *Id.* at 783–84.

The United States Supreme Court, in a three-way split decision, affirmed the district court decision. *Brown v. Thomson,* 462 U.S. 835, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983). Justices Powell, Burger and Rehnquist constituted the plurality. Recognizing the narrowness of the issue, Justice Powell adopted the *de minimis* rationale applied by the district court. He also noted that the state policy 'of preserving county boundaries was applied nondiscriminatorily. *Id.* at 847–48, 103 S.Ct. at 2698–99.

In a concurring opinion joined by Justice Stevens, Justice O'Connor recognized the need for "flexibility in assessing the size of the deviation against the importance, consistency, and neutrality of the state policies alleged to require the population disparities." *Id.* at 848, 103 S.Ct. at 2699. However, she reemphasized that the Court did not suggest that "Wyoming's nondiscrimi-

natory adherence to county boundaries justifies the population deviations that exist throughout Wyoming's representative districts." *Id.* at 849, 103 S.Ct. at 2699. Justice O'Connor further explained that "[a]lthough the maximum deviation figure is not the controlling element in an apportionment challenge, even the consistent and nondiscriminatory application of a legitimate state policy cannot justify substantial population deviations throughout the State where the effect would be to eviscerate the one-person, one-vote principle." *Id.* She expressed her "gravest doubts that a statewide legislative plan with an 89% maximum deviation could survive constitutional scrutiny despite the presence of the State's strong interest in preserving county boundaries." *Id.* at 850, 103 S.Ct. at 2700.

Justice Brennan, writing in dissent on behalf of Justices White, Marshall and Blackmun, concluded that "Wyoming's 1981 House of Representatives apportionment [was] manifestly unconstitutional ... whether one consider[ed] the instance of Niobrara County alone or in combination with the large deviations present in the rest of the scheme." *Id.* at 853, 103 S.Ct. at 2701.

While these prior decisions help to put the current litigation into historical context, we must recognize the expanded scope, changed conditions and significance of the present challenge.

### III. FACTS

The significant facts relevant to this case are straightforward and undisputed. The Fifty–First Legislature of the State of Wyoming, during its 1991 General Session, enacted Enrolled Act No. 81, Chapter 165, which reapportioned the Wyoming State House of Representatives and the Wyoming State Senate based on the 1990 United States census. The numerical nature and impact of this apportionment plan is set forth in Appendices I and II. Section 3(a) of the enrolled act—the legislature's

statement of justification for the plan—is reproduced in Appendix III.

The 1990 federal census fixed Wyoming's population at 453,588. Based upon that figure, the legislature determined the House should be comprised of sixty-four members and the Senate thirty-one members. Under the 1991 Reapportionment Act all Senate and House districts elect candidates at large.

With regard to the House apportionment under the 1991 Act, each county constitutes an election district. Therefore, each of Wyoming's twenty-three counties is allocated one representative, regardless of the county population. The remaining forty-one House seats are then allocated among the fifteen more populous counties. The number of seats per election district (county) range from one to nine. The ideal ratio of citizens per representative is calculated by dividing the total state population by the sixty-four available House seats. That ratio, using the 1990 census figure, is 7,087 to 1. As illustrated by the stipulated data in Appendix I, the 1991 plan results in an 83% range of deviation from that ideal (from 65% overrepresentation to 18% underrepresentation). Voters in Niobrara County have 3.36 times the voting power in the House of Representatives as voters in Washakie County. Washakie County citizens elect one representative—the same as Niobrara County which has less than one-third the population of Washakie County. For analytical purposes, it is worth noting that even if Niobrara County were excluded from the population deviation calculation because of its disproportionately low population, the range of deviation from the ideal citizen to representative ratio still exceeds 50%.[7] This data further indicates that representatives from counties containing 46% of the state population theoretically control 52% of the House vote.

The Senate reapportionment demonstrates lower, but still significant, population inequalities. As illustrated in Appendix II, the legislature created seventeen

---

**7.** Unlike the situation in *Brown,* the 1991 legislature did not consider and reject a 63–seat House plan which would have denied a seat to only Niobrara County. Therefore, we make this ob- servation for the purpose of illustrating the significant population inequality notwithstanding the representation of Niobrara County, in the context of a challenge to the entire 1991 plan.

senatorial districts: eleven single-county districts, and six districts composed of two contiguous counties each. The number of seats per senatorial election district range from one to four. The ideal citizen per senator ratio is 14,632 to 1 (453,588 citizens divided by 31 available seats). The 1991, seventeen-district Senate plan results in a 58% range of deviation from that ideal (from 30% overrepresentation to 28% underrepresentation), with senators from counties containing 45% of the state population theoretically controlling 52% of the Senate vote. Voters in the Goshen/Platte district have 1.82 times the voting power in the Senate as voters in the Uinta district.

A number of alternative reapportionment plans were offered to and rejected by the 1991 legislature. Several of these alternatives provided greater voter equality by reducing the substantial deviations which now exist. Some alternative plans also largely preserved traditional county boundaries. However, the legislature adopted the current plan—a plan which fails to achieve substantial voter equality among election districts—for the reasons expressed in section 3(a) of the Act. *See* Appendix III.

## IV.  OVERVIEW OF APPLICABLE REAPPORTIONMENT LAW

*Constitutional Protection of Voting Rights*

The conception of political equality from the Declaration of Independence to Lincoln's Gettysburg Address, to the 15th, 17th and 19th Amendments can mean only one thing—one person, one vote.

*Gray v. Sanders*, 372 U.S. 368, 381, 83 S.Ct. 801, 809, 9 L.Ed.2d 821 (1963).

The right to vote is a fundamental, individual right entitled to judicial protection under the Fourteenth Amendment. In *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the first of what was to

prove a decennial appearance of reapportionment cases, the United States Supreme Court held that allegations of a denial of equal protection of voting rights present a justiciable constitutional cause of action. Furthermore, as alleged in the present case, "[w]hen a State makes classifications of voters which favor residents of some counties over residents of other counties, a justiciable controversy is presented." *Moore v. Ogilvie*, 394 U.S. 814, 817, 89 S.Ct. 1493, 1495, 23 L.Ed.2d 1 (1969). The equal protection clause of the Fourteenth Amendment mandates that "[n]o state shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Consequently, courts may insure that "[a]ll procedures used by a State as an integral part of the election process ... pass muster against the charges of discrimination or of abridgment of the right to vote." *Moore*, 394 U.S. at 818, 89 S.Ct. at 1495–96 (citations omitted).

That the right to vote is too important to be stripped of judicial protection illustrates the fundamental nature of an individual's right to influence the course of government equally through the franchise. The United States Supreme Court, recognizing the Framers' intent that persons qualified to vote have a constitutional right to vote and to have their votes counted,[8] has repeatedly emphasized the importance of this right: "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry*, 376 U.S. at 17, 84 S.Ct. at 535. "Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society, especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights." *Reynolds*, 377 U.S. at 561–62, 84 S.Ct. at 1381. "The

---

**8.** "'If the power is not immediately derived from the people, in proportion to their numbers, we may make a paper confederacy, but that will be all.'" *Wesberry v. Sanders*, 376 U.S. 1, 10, 84 S.Ct. 526, 531, 11 L.Ed.2d 481 (1964)

(quoting James Madison, 1 The Records of the Federal Convention of 1787 (Farrand ed. 1911) 472); *see also Reynolds v. Sims*, 377 U.S. 533, 554, 84 S.Ct. 1362, 1377, 12 L.Ed.2d 506 (1964).

right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government. And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Id.* at 555, 84 S.Ct. at 1378.

The value of the right to vote and the right to equality among voters is also evidenced in the Wyoming Constitution, which, unlike the federal Constitution, explicitly guarantees equal political rights to state citizens.[9] The state constitution also prohibits absolute, arbitrary power, even in the largest majority,[10] and mandates that "[e]lections shall be open, free and equal, and no power ... shall at any time interfere to prevent an untrammeled exercise of the right of suffrage"[11]—a right characterized by the Wyoming Supreme Court as "fundamental ... entitled to the strict protection of the courts." *Brimmer v. Thomson*, 521 P.2d 574, 578 (Wyo.1974) (citations omitted).

*Constitutionality of State Legislative Reapportionment*

Numerous cases have defined and refined the scope of voting rights within the specific context of state legislative reapportionment. Beginning with the seminal case of *Reynolds v. Sims*, the integrity of an individual's representation in the state legislature has been measured against the "one person, one vote" principle.[12]

In *Reynolds*, the United States Supreme Court, for the first time, considered "whether there are any constitutionally cognizable principles which would justify departures from the basic standard of equality among voters in the apportionment of seats in state legislatures." *Reynolds*, 377 U.S. at 561, 84 S.Ct. at 1381. The law established in *Reynolds* is straightforward:

> [A]s a basic constitutional standard, the Equal Protection Clause requires that the seats in *both houses* of a bicameral state legislature *must be apportioned on a population basis* .... [A]n individual's right to vote for state legislators is constitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living in other parts of the State.

*Id.* at 568, 84 S.Ct. at 1385 (emphasis added). *Reynolds* made clear that the equal protection clause requires that a state make an honest and good faith effort to meet this basic standard—"to construct districts, in both houses of its legislature, as nearly of equal population as is practicable." *Id.* at 577, 84 S.Ct. at 1390.

Rather than formulate a rigid constitutional test, the *Reynolds* Court outlined the following general considerations for applying this equality standard to the unique

9. Article I, § 3 provides:
   Since equality in the enjoyment of natural and civil rights is only made sure through political equality, the laws of this state affecting the political rights and privileges of its citizens shall be without distinction of race, color, sex, or *any circumstance or condition whatsoever* other than individual incompetency, or unworthiness duly ascertained by a court of competent jurisdiction.
   (Emphasis added).
   The Wyoming Constitution also contains a general equal protection provision which states that "[i]n their inherent right to life, liberty and the pursuit of happiness, all members of the human race are equal." Wyo. Const. art. I, § 2.

10. Article I, § 7 provides: "Absolute, arbitrary power over the lives, liberty and property of freemen exists nowhere in a republic, not even in the largest majority."

11. Wyo. Const. art. I, § 27.

12. The phrase "one person, one vote" was first used by the Court in *Gray*, 372 U.S. at 379–81, 83 S.Ct. at 808;

   The concept of "we the people" under the Constitution visualizes no preferred class of voters but equality among those who meet the basic qualifications. The idea that every voter is equal to every other voter in his State, when he casts his ballot in favor of one of several competing candidates, underlies many of our decisions....

   ....

   The conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing—one person, one vote.

reapportionment circumstances in each state:

1. Some limited divergence from population equality is permissible in either or both legislative houses "[s]o long as the divergences from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy." *Id.* at 579, 84 S.Ct. at 1391.

2. A state's desire to construct districts along political subdivision (i.e., county) lines to insure some voice to political subdivisions, as political subdivisions, or to deter the possibilities of gerrymandering may be legitimate. However, "neither history alone, nor economic or other sorts of group interests, are permissible factors in attempting to justify disparities from population-based representation." *Id.* at 579–80, 84 S.Ct. at 1391 (footnote omitted). Furthermore, "[c]onsiderations of area alone provide an insufficient justification for deviations from the equal-population principle." *Id.*

3. While the promotion of compact, contiguous districts is a legitimate state interest, arguments that deviations are justified because they promote effective representation for sparsely settled areas and provide for optimum access of citizens to their representatives are largely unconvincing in today's modern world. *Id.* at 580, 84 S.Ct. at 1391.

4. The overriding objective must always be "substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the State." *Id.* at 579, 84 S.Ct. at 1390.

Cases subsequent to *Reynolds* have built upon these fundamental principles. Most significantly, the post-*Reynolds* cases emphasize the narrowness of the exception to the strict equality standard, and define the burdens imposed on both plaintiffs and defendants in the context of a reapportionment challenge.

Beginning with *Swann v. Adams*, 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967), the Court has repeatedly empha-sized that the latitude granted to state legislative reapportionment plans by *Reynolds* is limited. Only "those *minor* variations which 'are based on legitimate considerations incident to the effectuation of a rational state policy'" demonstrate substantial compliance with the goal of population equality. *Id.* 385 U.S. at 444, 87 S.Ct. at 572 (emphasis added) (quoting *Reynolds,* 377 U.S. at 579, 84 S.Ct. at 1390); *see also Chapman v. Meier,* 420 U.S. 1, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975); *Kilgarlin v. Hill,* 386 U.S. 120, 87 S.Ct. 820, 17 L.Ed.2d 771 (1967); *Roman v. Sincock,* 377 U.S. 695, 84 S.Ct. 1449, 12 L.Ed.2d 620 (1964). States may, therefore, justify only those population disparities deemed "minor." Greater disparities are presumably facially invalid. *See Cosner v. Dalton,* 522 F.Supp. 350, 356–58 (E.D.Va.1981). "[A] State's policy urged in justification of disparity in district population, however rational, cannot constitutionally be permitted to emasculate the goal of substantial equality." *Mahan v. Howell,* 410 U.S. 315, 326, 93 S.Ct. 979, 986, 35 L.Ed.2d 320 (1973).

■ Thus far, the Court has provided only one definitive benchmark—the ten percent *de minimis* rule. Under this rule, a state need not justify *"minor"* population inequalities because "some deviations from population equality may be necessary to permit the States to pursue other legitimate objectives such as 'maintain[ing] the integrity of various political subdivisions' and 'provid[ing] for compact districts of contiguous territory.'" *Brown,* 462 U.S. at 842, 103 S.Ct. at 2696 (quoting *Reynolds,* 377 U.S. at 578, 84 S.Ct. at 1390). Furthermore, " '[a]n unrealistic overemphasis on raw population figures, a mere nose count in the districts, may submerge these other considerations and itself furnish a ready tool for ignoring factors that in day-to-day operation are important to an acceptable representation and apportionment arrangement.' " *Id.* (quoting *Gaffney v. Cummings,* 412 U.S. 735, 745, 93 S.Ct. 2321, 2327, 37 L.Ed.2d 298 (1973)). The Court held that " 'minor deviations from mathematical equality among state legislative districts are insufficient to make out a

prima facie case of invidious discrimination under the Fourteenth Amendment so as to require justification by the State.'" *Id.* (quoting *Gaffney,* 412 U.S. at 749, 93 S.Ct. at 2329). An apportionment plan creating a maximum population deviation less that 10% is considered to be "minor," and therefore may not substantially dilute the weight of individual votes so as to deny individuals fair and effective representation. *White v. Regester,* 412 U.S. 755, 764, 93 S.Ct. 2332, 2338, 37 L.Ed.2d 314 (1973).

■ Once plaintiffs demonstrate population inequalities greater than 10%, however, the burden shifts to the state to justify the suspect plan. *Brown,* 462 U.S. at 843, 103 S.Ct. at 2696. In other words, the state must prove that it made an honest and good faith effort to construct legislative districts as nearly of equal population as is practicable by showing that the population inequalities are unavoidable or justified upon any legally acceptable ground. *See Swann,* 385 U.S. at 446, 87 S.Ct. at 573. Acceptable reasons for the population inequalities among various legislative election districts are essentially those outlined by the Court in *Reynolds.* A state's justification will be largely discredited, however, if the Court finds that alternative plans are available which both further the state's rational interest and achieve greater voter equality. For example, the 16.4% population deviation upheld in *Mahan* was supported by uncontradicted evidence that the plan "produc[ed] the *minimum* deviation above and below the norm, keeping intact political boundaries." *Mahan,* 410 U.S. at 326, 93 S.Ct. at 986 (emphasis added). *See also Swann,* 385 U.S. at 445–46, 87 S.Ct. at 572–73; *Connor v. Finch,* 431 U.S. 407, 420, 97 S.Ct. 1828, 1836, 52 L.Ed.2d 465 (1977). Recall also that a state's justification, no matter how rational, will never be permitted to undermine the "substantial equality," "one person, one vote" objective.

Notably absent from the post-*Reynolds* legislative reapportionment cases is any attempt by the Court to define the precise point at which a state may no longer justify its plan—the point at which population inequalities undermine the "substantial equali-ty" standard. In *Roman,* 377 U.S. at 710, 84 S.Ct. at 1458, decided the same day as *Reynolds,* the Court took the position that:

> [T]he problem does not lend itself to any such uniform formula, and it is neither practicable nor desirable to establish rigid mathematical standards for evaluating the constitutional validity of a state legislative apportionment scheme under the Equal Protection Clause. Rather, the proper judicial approach is to ascertain whether, under the particular circumstances existing in the individual state whose legislative apportionment is at issue, there has been a faithful adherence to a plan of population-based representation, with such minor deviations only as may occur in recognizing certain factors that are free from any taint of arbitrariness or discrimination.

Employing this approach, many diverse reapportionment plans have been upheld and struck down. While it is difficult to extract rules of general applicability because "[w]hat is marginally permissible in one State may be unsatisfactory in another, depending on the particular circumstance of the case," *Reynolds,* 377 U.S. at 578, 84 S.Ct. at 1390, a potential upper limit has been suggested. In upholding a 16.4% population deviation in a Virginia reapportionment plan, the Court warned that "this percentage [16.4%] may well approach tolerable limits." *Mahan,* 410 U.S. at 329, 93 S.Ct. at 987. The only other hint as to a concrete limit is found in *New York City Board of Estimate v. Morris,* 489 U.S. 688, 109 S.Ct. 1433, 103 L.Ed.2d 717 (1989), where the Court noted that "no case of ours has indicated that a deviation of some 78% could ever be justified." *Id.* at 702, 109 S.Ct. at 1442 (citations omitted).

## V. CONSTITUTIONAL VALIDITY OF WYOMING'S 1991 LEGISLATIVE REAPPORTIONMENT ACT

It is against the backdrop of facts, history and legal precedent presented that we must now evaluate Wyoming's 1991 Reapportionment Act.

*Population Inequality*

█ Our first inquiry is whether Plaintiffs' proof of population inequality among the election districts under the 1991 Act amounts to a prima facie showing of noncompliance with the "substantial equality" voting rights standard.

Simple mathematical principles govern population inequality issues in legislative apportionment cases. Since *Reynolds*, the United States Supreme Court has consistently utilized the "maximum population deviation" measure to express the relevant inequalities. Using this method, maximum population deviation is calculated in four steps:

1. Determine the ideal population per representative by dividing the apportionment base (state population) by the number of legislators in the legislative house under consideration.

2. Determine the percentage of underrepresentation by taking each district that has more persons than the ideal district, subtracting the ideal district population from the actual district population, then dividing this number by the ideal district population.

3. Determine the percentage of overrepresentation by taking each district that has fewer persons than the ideal district, subtracting the actual district population from the ideal district population, then dividing this number by the ideal district population.

4. Determine the percentage maximum population deviation by taking the percentages of underrepresentation and overrepresentation (calculated in steps 2 and 3), identifying the district that is most overrepresented and the district that is most underrepresented, and then adding those two percentages.

*See, e.g., Brown v. Thomson,* 462 U.S. 835, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983); *Chapman v. Meier,* 420 U.S. 1, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975).

Using this accepted measure, Plaintiffs presented uncontradicted evidence showing the maximum population deviation in the Wyoming House of Representatives under the 1991 Act is approximately 83%. Under that same Act, the maximum population deviation in the Wyoming Senate is approximately 58%. Plaintiffs have demonstrated population inequalities substantially greater than the 10% threshold. In light of Plaintiffs' prima facie claim of invidious discrimination under the Fourteenth Amendment, the State now bears the burden of demonstrating the Wyoming legislature fulfilled its good faith obligation to achieve substantial voter equality.

*Constitutional Limits*

At this point the path ends and our journey through the thicket begins. Wyoming's 1991 Reapportionment Act presents an unanswered issue: What degree of population inequality among election districts in Wyoming constitutes an intolerable invasion upon individual voting rights, notwithstanding the presence and effectuation of rational state interests? We know from three decades of reapportionment jurisprudence that such a limit exists; however, "[n]either courts nor legislatures are furnished any specialized calipers that enable them to extract from the general language of the Equal Protection Clause of the Fourteenth Amendment the mathematical formula that establishes what range of percentage deviations is permissible, and what is not." *Mahan,* 410 U.S. at 329, 93 S.Ct. at 987.

Ours is the difficult task of applying this elusive "substantial equality" standard to the circumstances of the present case. In so doing, we must consider (1) whether the percentage population deviations inherent in the 1991 Act are so great as to be facially invalid; and (2) whether the evidence supports a finding that the substantial population inequalities created by the 1991 Act are either unavoidable or justified upon any legally acceptable ground.

Although the United States Supreme Court has never declared a state legislative reapportionment plan facially invalid, the law would likely support such a conclusion in this case.

To implement the "one person, one vote" principle a state must "make an honest and good faith effort to construct districts ...

as nearly of equal population as is practicable." *Reynolds*, 377 U.S. at 577, 84 S.Ct. at 1390. States have limited permission to deviate from that ideal if the deviations "are based on legitimate considerations incident to the effectuation of a rational state policy." *Id.* at 579, 84 S.Ct. at 1391. However, "[e]ven a neutral and consistently applied criterion such as use of counties as representative districts can frustrate *Reynolds'* mandate of fair and effective representation if the population disparities are excessively high." *Brown*, 462 U.S. at 845, 103 S.Ct. at 2697 (footnote omitted). The Court has never held that legitimate state interests, alone or aggregated, can justify population inequalities as large as those that exist throughout Wyoming's election districts under the 1991 Reapportionment Act.

As mentioned, the *Mahan* Court warned that a 16.4% deviation "may well approach tolerable limits...." 410 U.S. at 329, 93 S.Ct. at 987. The *Morris* Court acknowledged that "no case of ours has indicated that a deviation of some 78% could ever be justified." 489 U.S. at 702, 109 S.Ct. at 1442. Furthermore, in *Gaffney*, 412 U.S. at 744, 93 S.Ct. at 2326, the Court found that a review of Supreme Court reapportionment cases made it "apparent that the larger variations from substantial equality are too great to be justified by any state interest so far suggested" (referring to *Swann*, (25.65%); *Kilgarlin*, (26.48%);[13] and *Whitcomb v. Chavis*, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971), (24.-78%)[14]).

Wyoming's population deviation in both the Senate (58%) and the House (83%) greatly exceeds those previously found unacceptable by the Court. We conclude, therefore, that the Wyoming 1991 Reapportionment Act is facially unconstitutional simply because the population inequality created by the Act exceeds tolerable equal protection limits.

█ Apart from the apparent facial unconstitutionality of the Wyoming Reapportionment Act, we find the gross percentage deviations among the populations of the legislative districts intolerable and unjustified because they are avoidable.

Courts are presented with two possible reapportionment scenarios: (1) A given reapportionment plan represents a state legislature's best effort to achieve substantial equality and promote rational state policies; or (2) a given reapportionment plan represents the less "equal" of several alternative plans that promote rational state policies. The first scenario presents the cleaner issue—once the legislature has done the best it can, the court can focus on whether the deviations are within constitutional limits. Unfortunately, this is not the case before us. We are faced instead with a situation where the Wyoming legislature seeks to justify the weaker of several alternative plans. This second scenario dictates a "best result" approach in which avoidability becomes the determinative factor.

The following analysis supports our conclusion. Examining the 1991 Act as a whole, as well as the State's asserted justification, we ask:[15] (1) What is the magni-

---

**13.** The states involved in *Swann* and *Kilgarlin* failed to articulate state policies sufficient to justify the deviations from population equality; therefore, the Court was not required to address the issue of whether any policy could justify such large deviations.

**14.** In *Whitcomb,* the Court found the population variance of 24.78% to be a "convincing showing of malapportionment," and affirmed the district court's order requiring reapportionment, notwithstanding the state's articulated interest in preserving district boundaries. 403 U.S. at 136 n. 14, 162, 91 S.Ct. at 1865 n. 14, 1878.

**15.** This four-part analysis is in line with, and represents a refinement of, the three-part test

applied by the United States Supreme Court in *Mahan.* In *Mahan,* the Court made the following inquiry: (1) Is the reason advanced by the state a rational one, "'free from any taint of arbitrariness or discrimination'"? (2) Can it reasonably be said that the state policy urged as justification for the divergences in the reapportionment plan is furthered by the plan adopted? (3) If justified, are the divergences within tolerable limits? 410 U.S. at 325–28, 93 S.Ct. at 985–87 (quoting *Roman,* 377 U.S. at 710, 84 S.Ct. at 1458); *see also Travis v. King,* 552 F.Supp. 554, 560 (D.Hawaii 1982).

This equal protection analysis is also congruent with the balancing approach discussed in *Brown v. Thomson,* 462 U.S. at 845–46, 103 S.Ct. at 2697–98: "The consistency of application and

tude of the intrusion on an individual's fundamental right to vote? (2) Did the State employ legitimate considerations incident to the effectuation of a rational state policy? [16] (3) Can the current plan reasonably be said to advance the State's interest? (4) What, if any, alternative methods are available that would achieve greater voter equality, yet advance the State's interest?

We first examine the extent to which the legislature has intruded upon the "one person, one vote" principle. The uncontradicted evidence demonstrates this is not a case of taking just a little from everyone for the benefit of a few. The intrusion is neither insignificant nor indifferent. Approximately 70% of Wyoming's citizens are underrepresented in the House of Representatives, 68% are underrepresented in the Senate.

The final House plan discloses that nearly one-third of Wyoming's counties (7 of 23) have greater than 20% more voting power based on relative population deviation from the ideal (Big Horn—25.75%; Converse—21.49%; Crook—25.30%; Hot Springs—32.15%; Niobrara—64.74%; Sublette—31.67%; Teton—21.18%). Nearly one-half of Wyoming's counties (11 of 23) have greater than 10% more voting power (adding Goshen—12.71%; Johnson—13.30%; Lincoln—10.93%; Uinta—12.03%). See Appendix I. This significant degree of overrepresentation is not without a price. The numbers alone dictate that Laramie County should be allocated 10 seats in the House (74,142 divided by 7087). Under the 1991 Act, however, Laramie County received only 9 House seats. Citizens in Laramie County were forced to surrender one representative for the benefit of less populated coun-

ties. Likewise, Niobrara, Hot Springs, Sublette and Crook counties, representing a total population of 17,445 citizens, were collectively allocated 4 House seats, while Carbon County, population 16,659, received only 2 seats. Under the 1991 House plan, a single citizen's vote in one of the four smaller counties counts nearly twice that of a Carbon County voter.

Unlike the House plan, the Senate plan incorporates multi-county election districts in accordance with the mandate of *Schaefer v. Thomson.* Nonetheless, substantial voter inequity is disclosed by the 1991 seventeen-district Senate plan. In the Senate, 3 of 17 districts have greater than 20% more voting power (Big Horn—28.07%; Goshen/Platte—29.89%; Park—20.80%). Six of 17 districts exceed 10% more voting power (adding Crook/Weston—19.27%; Lincoln—13.72%; Sweetwater 11.56%). See Appendix II. Again, these counties benefitted most at the expense of Laramie County, which was entitled to 5 Senate seats (73,142 divided by 14,632), but received only 4.

The size and extent of population inequality throughout the election districts for both houses of the legislature, and the fact that the 1991 Act takes significant representation away from some in order to give to others, make it readily apparent that the magnitude of intrusion on the individual voting rights of Wyoming citizens under the present Act is significant, indeed. More accurately, the magnitude of intrusion, as evidenced by the degree of malapportionment, is overwhelming.

Next we must examine the rationale articulated by the Wyoming legislature as

the neutrality of effect of the nonpopulation criteria must be considered along with the size of the population disparities in determining whether a state legislative apportionment plan contravenes the Equal Protection Clause."

16. The appropriate equal protection standard to use in evaluating a state's justification for deviation from equal population distribution of voting power is not entirely clear. The Court has noted that "the proper equal protection test is not framed in terms of 'governmental necessity,' but instead in terms of a claim that a State may 'rationally consider.'" *Mahan,* 410 U.S. at 326, 93 S.Ct. at 986 (citation omitted). Other cases

advise "careful judicial scrutiny" when evaluating the character and the degree of deviation from a strict population basis in state reapportionment plans. *Abate v. Mundt,* 403 U.S. 182, 185, 91 S.Ct. 1904, 1906, 29 L.Ed.2d 399 (1971); *Reynolds,* 377 U.S. at 581, 84 S.Ct. at 1391.

To the extent that a standard has been identified, it is less definite, and ostensibly less stringent, than that applied to judicial review of other fundamental rights under the equal protection clause. *See e.g., Mahan,* 410 U.S. at 340–41, 93 S.Ct. at 993 (Brennan, J., concurring in part, dissenting in part); L.H. Tribe, *American Constitutional Law* § 13–6 at 1073 (2d ed. 1988).

**1442**

the basis for adopting the challenged plan. Senator Scott and Representative Zumbrunnen testified that the population inequality inherent in the 1991 Reapportionment Act was justified on the basis of the State's policy to preserve the integrity of county boundaries as election districts.[17] That this is a recognized, legitimate state policy is beyond dispute; however, legitimacy must also extend to the considerations of the legislature incident to the effectuation of this policy.[18] The Wyoming legislature's principal considerations fail in this regard.

First, Defendants argue that Wyoming is unique, that its sparseness, its distribution of a small population over a large geographic area, its geographical features, and its varied social, economic and political communities somehow excuse Wyoming lawmakers from their constitutional duty to accomplish substantial voter equality when reapportioning the state legislature.[19] During trial, Defendants spent considerable time and effort attempting to demonstrate the unique importance of county government in Wyoming and to identify unique regional interests deserving of independent representation.

While there can be little doubt that many Wyoming counties possess a sense of identity, a sense of neighborhood and a sense of community interests, the bottom line is that citizens and not governmental units or regional interests are entitled to elect lawmakers. Evidence as to the relative importance of counties is of little help to a court constitutionally bound to protect individual voting rights. "Legislators represent people, not trees or acres.... Citizens, not history or economic interests, cast votes." *Reynolds,* 377 U.S. at 562, 580, 84 S.Ct. at 1381, 1391. To the extent that legitimate considerations were articulated for insuring some voice to Wyoming counties, as counties (i.e., representation concerning legislation directed specifically to the concerns of a particular county), those considerations are negated because the legislature has carried the policy of county representation to an unconstitutional extreme.[20]

Defendants next argue that because "fair and effective" representation is not self-defining, the court should look beyond mere numbers. Defendants presented evidence of Wyoming's boom and bust economy, the effect of population fluctuations in a sparsely populated state, and the inherent weaknesses in census data. They assert the court should have greater tolerance for deviations from the "one person, one vote" principle under these circumstances. What Defendants have overlooked, however, is the unmistakable decree from *Reynolds* that "[w]hatever the means of accomplishment, the *overriding objective* [for the legislature] *must be substantial equality of population among the various districts,* so that the vote of any citizen is approximately equal in weight to that of any other citizen in the State." 377 U.S. at 579, 84 S.Ct. at 1390 (emphasis added).

The Court has recognized the practical impossibility of mathematical precision and the need for flexibility. *Id.* at 577, 84 S.Ct.

17. *See also* House Enrolled Act No. 81 (1991), section 3(a), reproduced at Appendix III.

18. "A State may legitimately desire to maintain the integrity of various political subdivisions, insofar as possible, and provide for compact districts of contiguous territory in designing a legislative apportionment scheme. *Valid considerations may underlie such aims." Reynolds,* 377 U.S. at 578, 84 S.Ct. at 1390 (emphasis added).

19. Wyoming's uniqueness, as relevant to reapportionment, is debatable. Many states, western states in particular, have relatively few citizens spread over huge areas. To adopt Defendants' rationale would be to exempt many "ru-

ral" states (i.e., the Dakotas, Utah, Montana, Nevada, Alaska) from according their citizens substantial equality at the ballot box. In addition, a "uniqueness" argument could probably be fashioned for any political subdivision of any state. Any extension of this rationale would, therefore, render equal protection of voting rights meaningless.

20. "Carried too far, a scheme of giving at least one seat in one house to each political subdivision (for example, to each county) could easily result, in many States, in a total subversion of the equal-population principle in that legislative body.... Such a result ... would be constitutionally impermissible." *Reynolds,* 377 U.S. at 581, 84 S.Ct. at 1391–92.

at 1389. More importantly, the Court has already considered Defendants' argument and has provided state legislatures with a discrete range of flexibility:

> Fair and effective representation ... does not depend solely on mathematical equality among district populations. There are other relevant factors to be taken into account and other important interests that States may legitimately be mindful of. *See Mahan v. Howell, supra; Abate v. Mundt,* 403 U.S. 182 [91 S.Ct. 1904, 29 L.Ed.2d 399] (1971); *Dusch v. Davis,* 387 U.S. 112 [87 S.Ct. 1554, 18 L.Ed.2d 656] (1967); *Sailors v. Board of Education,* 387 U.S. 105 [87 S.Ct. 1549, 18 L.Ed.2d 650] (1967); *Burns v. Richardson,* [384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966)]. An unrealistic overemphasis on raw population figures, a mere nose count in the districts, may submerge these other considerations and itself furnish a ready tool for ignoring factors that in day-to-day operation are important to an acceptable representation and apportionment arrangement.
>
> ....
>
> ... We have repeatedly recognized that state reapportionment is the task of local legislatures or of those organs of state government selected to perform it. Their work should not be invalidated under the Equal Protection Clause when only minor population variations among districts are proved.

*Gaffney,* 412 U.S. at 748–51, 93 S.Ct. at 2329–30 (footnotes omitted). "[Supreme Court] decisions have established, as a general matter, that an apportionment plan with a maximum population deviation under 10% falls within this category of minor deviations." *Brown,* 462 U.S. at 842, 103 S.Ct. at 2696. A plan with population inequalities greater than 10% must be justified by the state—supported by a rational state policy, not by attenuated arguments concerning possible census inaccuracies and population fluctuations. This court does not desire, nor are we in the position to grant the legislature greater license to intrude upon this established principle.

Defendants also argue that gerrymandering cannot take place if counties serve as election districts. We find the legislature's assertion here to be little more than an empty threat. The Court has acknowledged that "[i]ndiscriminate districting, without any regard for political subdivision or natural or historical boundary lines, may be little more than an open invitation to partisan gerrymandering." *Reynolds,* 377 U.S. at 578–79, 84 S.Ct. at 1390. Yet Defendants presented no evidence to demonstrate a reasonable likelihood that future Wyoming legislatures would act in bad faith to promote partisan interests over the State's best interest. Wyoming's legislatures have typically been populated by lawmakers of outstanding integrity. We are unwilling to assume the future holds otherwise.

Fundamentally, redistricting versus reapportionment is a distinction without a difference under the equal protection clause. Whether drawing election district lines or allocating lawmakers within existing lines, there can be but one class of voters—all citizens must be equally powerful at the ballot box. Were the court to allow the mere possibility of a gerrymander to defeat the principle of "one person, one vote," the concept of equal protection would quickly become a relic of the past.

Finally, Defendants argue that the 1991 Act is valid because it is statistically indistinguishable from Wyoming's 1963, 1971 and 1981 court-approved, county-based reapportionment plans. This argument is completely without merit. The United States Supreme Court decisions in *Schaefer v. Thomson* and *Brown v. Thomson* are neither authority for nor relevant to the question of validity of the 1991 Reapportionment Act. As discussed above, each of those cases turned on issues narrower than the current challenge. To the extent that language in either case might support Defendants' case here, two wrongs do not make a right. In addition, *Schaefer v. Thomson* was decided prior to *Gaffney v. Cummings* and *White v. Regester,* which shifted the burden to the state to justify plans exhibiting greater than 10% population deviations. This court must evaluate the constitutionality of the 1991 Act in light

of the full slate of Supreme Court precedent, 1990 census data and circumstances as they exist in Wyoming today.

Our third inquiry is whether the current plan reasonably advances a rational state policy. There is little doubt that the reapportionment plan adopted by the Wyoming legislature furthers the State's interest in preserving the integrity of county boundaries. Each county was allocated a representative, regardless of its population. Individual counties were allocated senators to the greatest extent possible. Multi-county senatorial districts were formed only where necessary to comply with the liberal standards imposed by *Schaefer v. Thomson*. Although Defendants maintain that the 1991 Reapportionment Act is primarily population-based, the Act best effectuates a system of regional representation. If the State's policy could be supported by legitimate considerations, and if the legislature had not carried effectuation of this policy to an unconstitutional extreme, then this third inquiry would be of greater importance. As it stands, however, the fact that the Act furthers the State's interest is of little comfort because the legislature has allowed factors other than population equality to emasculate the "one person, one vote" principle.

Finally, we examine the alternatives. Justification of a reapportionment scheme, no matter how rational and no matter how well suited to a state's legitimate interest, rings hollow in the face of politically acceptable alternative methods of apportionment that further state goals *and* reduce inequality in voting power among election districts. Senator Scott testified that the Fifty–First Legislature considered but rejected such alternatives.[21] Several single-member and multi-member district plans were presented to the legislature which would have reduced population inequalities, yet largely maintained existing county boundaries as election district boundaries. This factor alone is sufficient to preclude justification of the gross population inequalities imparted by the 1991 Act. *See Kilgarlin*, 386 U.S. at 123, 87 S.Ct. at 822; *Chapman*, 420 U.S. at 26, 95 S.Ct. at 765; *Connor*, 431 U.S. at 420, 97 S.Ct. at 1836. Therefore, two factors—the availability of acceptable alternatives and the overwhelming magnitude of intrusion upon individual voting rights—absolutely compel our conclusion that the 1991 Reapportionment Act is constitutionally intolerable, notwithstanding any legitimate considerations incident to the effectuation of a rational state policy.

## VI. CONCLUSION

"The government is us; we are the government, you and I." T. Roosevelt—Speech 1902

Each and every Wyoming citizen has an inalienable right to full and effective participation in the political processes of this great state. Full and effective participation by all Wyoming citizens in state government requires that each citizen have

21. Senator Scott testified at length as to his perception of the representational problems presented by many of the proposed alternatives. The primary grounds for the legislature's rejection of those alternatives, he suggested, were geographical concerns, as well as the difficulties encountered when a constituent base is composed of competing and diverse interests.

The *Reynolds* Court, however, found that geographical considerations alone were insufficient to justify significant deviations in voter equality. 377 U.S. at 580, 84 S.Ct. at 1391. "Arguments for allowing such deviations in order to insure effective representation for sparsely settled areas and to prevent legislative districts from becoming so large that the availability of access of citizens to their representatives is impaired are today, for the most part, unconvincing." *Id.*

In addition, the difficulty of representing constituencies composed of competing interests is a fact of life for lawmakers at every level. Whether election district lines are drawn on the basis of county boundaries, city boundaries, or school district boundaries, lawmakers represent diverse interests. The legislature's position appears even more illogical given the high degree of diversity that presently exists within the counties the legislature so fervently protects. Laramie County is a good illustration. Pine Bluffs is an independent community in eastern Laramie County. The Pine Bluffs community has its own school district and an economic base distinct from the more urban community of Cheyenne. Senators and representatives from Laramie County must reconcile these different interests on a daily basis. Many other such examples exist.

an equally effective voice in the election of Wyoming lawmakers. Our state needs, and both the Wyoming Constitution and the United States Constitution demand, no less.

While it may not be possible to draw district lines with mathematical precision, that is no excuse for ignoring our Constitution's plain objective of making equal representation for equal numbers of people the fundamental goal for the Wyoming legislature. The cardinal democratic principle of "one person, one vote" should not be viewed as an obstacle. The legislature is constitutionally obliged to pursue fairness, not to exploit the exceptions. "The Constitution does not permit a State to relegate *considerations of equality to secondary status* and reserve as the primary goal of apportionment the service of some other state interest." *Mahan*, 410 U.S. at 340, 93 S.Ct. at 993 (Brennan, J., concurring in part and dissenting in part).

Equal representation is the "high standard of justice and common sense" that the Founders and the United States Supreme Court have set for us. *See Wesberry*, 376 U.S. at 18, 84 S.Ct. at 535. The Wyoming State Legislature has failed to meet this standard or to justify its departure from the substantial equality standard. As demonstrated, the reapportionment plan adopted by the Wyoming legislature is not the plan which will practicably provide the most equally responsive and accountable representation to each Wyoming citizen. The variance in population per senator or representative among election districts is so great as to render the 1991 Act facially invalid. Furthermore, the announced policy to preserve regional representation by preserving county boundaries as election district boundaries neither necessitates nor adequately justifies the substantial population variance created by the 1991 Reapportionment Act.

■ For these reasons, we hold: (1) The 1991 Wyoming Legislative Reapportion-ment Act, insofar as it provides for representation in the state House of Representatives, constitutes an invidious discrimination and violates the equal protection clause of the Fourteenth Amendment to the Constitution of the United States. (2) The 1991 Wyoming Legislative Reapportionment Act, insofar as it provides for representation in the state Senate, constitutes an *invidious discrimination*, and violates the equal protection clause of the Fourteenth Amendment to the Constitution of the United States. (3) Wyoming Const. art. III, § 3, which constitutes each county an election district and requires that each county be represented by at least one representative, is inconsistent with the application of the "one person, one vote" principle under circumstances as they presently exist in Wyoming. Consequently, the Wyoming State Legislature may disregard this provision when reapportioning either the Senate or the House of Representatives. (4) The judgment of this court, as reflected in (1)–(3) above, shall be a final judgment, subject to immediate review by either party. (5) This court retains jurisdiction of this case in all other respects, including the granting of injunctive and affirmative relief to Plaintiffs. This court is cognizant of the proximity of the forthcoming election cycle and it is our intent to have in place a constitutionally acceptable reapportionment plan prior thereto.

## VII. REMEDY

Recognizing that reapportionment is primarily a political and legislative process, we have chosen to retain jurisdiction and defer a hearing on the issuance of final injunctive relief, in order to give the Wyoming State Legislature an opportunity to act effectively by reapportioning in accordance with the guidelines set forth in this opinion.[22]

The state legislature is by far the best institution "to identify and then reconcile traditional state policies within the constitutionally mandated framework of substan-

---

**22.** Plaintiffs and Intervenors seek declaratory relief under 28 U.S.C. §§ 2201, 2202, and interlocutory or permanent injunctions restraining the enforcement, operation, or execution of the constitution and the statutes of the State of Wyoming by restraining the actions of state officers in the enforcement or execution of such constitutional or statutory provisions.

tial population equality." *Connor*, 431 U.S. at 414–15, 97 S.Ct. at 1833–34. The more appropriate function of this court is to provide the legislature with guidelines for legislative action within that framework. Unfortunately, under the circumstances of this case, aside from the fundamental legal principles already spelled out there is little more to offer. We cannot decide the next case at this point. We cannot predict what percentage of population deviation will be constitutionally permissible once the legislature has presented us with its best effort to achieve substantial voter equality. We can, however, offer the following:

1. Without exception, the legislature must make substantial population equality its overriding objective.

2. The State will have to justify any population deviation among election districts which exceeds 10%. Any reapportionment plan must strive to achieve substantial equality of population among the various election districts so that the vote of any one citizen is approximately equal in weight to that of every other citizen. Should this deviation in population among election districts exceed 10%, the burden on the State to articulate and justify its nonpopulation considerations is heavy. The Constitution does not treat lightly the dilution of the vote.

3. An undefined limit exists beyond which the State cannot justify population deviations among election districts.

4. Within the justifiable range of population deviation, the State must demonstrate a rational policy supported by legitimate considerations in the effectuation of that policy. We reemphasize that the legislature may legitimately pursue its desire to assure each county representation as a county. In fact, it is our hope that the legislature will be able to fashion a reapportionment plan that fulfills the citizens' needs for representation in

each individual county. What the legislature *may not do*, however, is elevate that pursuit above the pursuit of substantial equality among individual voters. Reapportionment according to regional interests, if achieved at the expense of significant intrusion upon individual voting rights, is intolerable. Counties do not stand on equal constitutional ground with citizens at the ballot box. The Constitution commands that we not exalt groups of citizens by giving to them inordinate voting power.

Moreover, it is important for the legislature to realize that if the court is forced to reapportion, the applicable standard is much stricter. "[T]he latitude in court-ordered plans for departure from the *Reynolds* standards in order to maintain county lines is considerably narrower than that accorded apportionments devised by state legislatures, and ... the burden of articulating special reasons for following such a policy in the face of substantial population inequalities is correspondingly higher." *Connor*, 431 U.S. at 419–20, 97 S.Ct. at 1836.

■ In addition, the court would have little choice but to reapportion the state into single-member districts. Whereas state-created multi-member districts are not *per se* unconstitutional and will be overturned only upon a showing that the plan operates to minimize or cancel out the voting strength of racial or political elements of the voting population, *Fortson v. Dorsey*, 379 U.S. 433, 436, 439, 85 S.Ct. 498, 500, 501, 13 L.Ed.2d 401 (1965), "single-member districts are to be preferred in court-ordered legislative reapportionment plans unless the court can articulate a 'singular combination of unique factors' that justifies a different result." *Connor*, 431 U.S. at 415, 97 S.Ct. at 1834 (citations omitted).[23] Therefore, "unless there are per-

---

**23.** Legislatures, as well as courts, should consider the practical weaknesses inherent in multimember districting schemes: voter confusion is more likely, legislative representatives are more remote from their constituents, and electoral minorities tend to be submerged while majorities are overrepresented. In addition, the evidence presented at trial tends to establish that candidates running for office in districts electing more than four representatives face significantly greater campaign costs and are less likely to defeat the incumbent. Voter participation was also noticeably lower in most multi-member districts.

suasive justifications, a court-ordered reapportionment plan of a state legislature must avoid use of multi-member districts, and, as well, must ordinarily achieve the goal of population equality with little more than *de minimis* variation." *Chapman,* 420 U.S. at 26–27, 95 S.Ct. at 766.

With these guidelines in mind, the reapportionment task now lies in the legislature's hands. "Legislative bodies should not leave their reapportionment tasks to the federal courts." *Wise v. Lipscomb,* 437 U.S. 535, 540, 98 S.Ct. 2493, 2497, 57 L.Ed.2d 411 (1978). A hearing upon the remedy is hereby scheduled for February 24, 1992. Defendants shall file any new reapportionment plan adopted by the Wyoming State Legislature no later than February 3, 1992. Plaintiffs and Intervenors shall have through and including February 10, 1992, to submit, in writing, any objections to the legislature's new plan, or, in the alternative, to offer any proposed plan accompanied by maps, census data, and other supporting materials. This hearing is primarily for the purpose of considering the validity of the legislature's new reapportionment plan; however, if the legislature has failed to enact a constitutionally permissible reapportionment plan by February 24, 1992, this court will exercise its

retained jurisdiction and judicially fashion a reapportionment plan in accordance with the strictest equal protection standard.

It is our intent, if possible, to avoid interference with the 1992 general election cycle, which begins with the certification of officers by the secretary of state between the twenty-fourth day of April and the third day of May.[24] We therefore express the hope and desire that the Wyoming legislature will rise to the occasion and adopt a constitutional reapportionment act prior to the February 24, 1992, hearing. We reemphasize that the legislature is the proper institution to complete this task. Any court-fashioned reapportionment plan would suffer from lack of citizen participation. Nonetheless, should the legislature be unwilling or unable to fashion a plan that complies with the Constitution, we will not hesitate to do so and reserve jurisdiction for this purpose.

Plaintiffs and Intervenors have each requested reasonable attorney's fees and costs pursuant to 42 U.S.C. §§ 1973*l* (e) and 1988. This court will entertain an appropriate motion, timely filed and supported by an itemized statement. Defendants will be given fifteen days to respond.

Judgment will be entered accordingly.

---

24. *See* Wyo.Stat. § 22–2–108 (Supp.1991).

## Appendix I

**FINAL HOUSE PLAN, CHAPTER 165**
HOUSE - 64 Seats using "Smallest Divisor" method, final census
numbers, and 23 house districts.

| A | B | C | D | E |
|---|---|---|---|---|
| District | 1990 Pop | Total Seats | Pop Per Rep | Rel Dev |
| LARAMIE | 73142 | 9 | 8127 | -14.67% |
| NATRONA | 61226 | 8 | 7653 | -7.99% |
| SWEETWATER | 38823 | 5 | 7765 | -9.56% |
| FREMONT | 33662 | 5 | 6732 | 5.01% |
| ALBANY | 30797 | 4 | 7699 | -8.63% |
| CAMPBELL | 29370 | 4 | 7343 | -3.60% |
| SHERIDAN | 23562 | 3 | 7854 | -10.82% |
| PARK | 23178 | 3 | 7726 | -9.01% |
| UINTA | 18705 | 3 | 6235 | 12.03% |
| CARBON | 16659 | 2 | 8330 | -17.53% |
| LINCOLN | 12625 | 2 | 6313 | 10.93% |
| GOSHEN | 12373 | 2 | 6187 | 12.71% |
| TETON | 11172 | 2 | 5586 | 21.18% |
| CONVERSE | 11128 | 2 | 5564 | 21.49% |
| BIG HORN | 10525 | 2 | 5263 | 25.75% |
| WASHAKIE | 8388 | 1 | 8388 | -18.35% |
| PLATTE | 8145 | 1 | 8145 | -14.92% |
| WESTON | 6518 | 1 | 6518 | 8.03% |
| JOHNSON | 6145 | 1 | 6145 | 13.30% |
| CROOK | 5294 | 1 | 5294 | 25.30% |
| SUBLETTE | 4843 | 1 | 4843 | 31.67% |
| HOT SPRINGS | 4809 | 1 | 4809 | 32.15% |
| NIOBRARA | 2499 | 1 | 2499 | 64.74% |
| WYOMING | 453588 | 64 | 7087 | |

| | B | C | D | E |
|---|---|---|---|---|
| TOTALS | 453588 | 64 | | |
| Maximum | 73142 | 9 | 8388 | 64.74% |
| Minimum | 2499 | 1 | 2499 | -18.35% |
| Range | 70643 | 8 | 5889 | 83.09% |
| Average | 19721 | 2.78 | | |

Minimum Controlling Pop = 208,491 people electing    33 reps.
  (Hypothetical)    45.96% of population;  51.56% of reps.

**FINAL SENATE PLAN, CHAPTER 165**
SENATE – 31 Seats using "Smallest Divisor" method, final census numbers, and 17 senate districts.

| A | B | C | D | E |
|---|---|---|---|---|
| District | 1990 Pop | Total Seats | Pop Per Senator | Rel Dev |
| LARAMIE | 73142 | 4 | 18286 | -24.97% |
| NATRONA | 61226 | 4 | 15307 | -4.61% |
| SWEETWATER | 38823 | 3 | 12941 | 11.56% |
| FREMONT | 33662 | 2 | 16831 | -15.03% |
| ALBANY | 30797 | 2 | 15399 | -5.24% |
| JOHN/SHER | 29707 | 2 | 14854 | -1.51% |
| CAMPBELL | 29370 | 2 | 14685 | -0.36% |
| PARK | 23178 | 2 | 11589 | 20.80% |
| GOS/PLA | 20518 | 2 | 10259 | 29.89% |
| UINTA | 18705 | 1 | 18705 | -27.84% |
| CARBON | 16659 | 1 | 16659 | -13.85% |
| SUB/TET | 16015 | 1 | 16015 | -9.45% |
| CONV/NIO | 13627 | 1 | 13627 | 6.87% |
| HS/WAS | 13197 | 1 | 13197 | 9.81% |
| LINCOLN | 12625 | 1 | 12625 | 13.72% |
| CRO/WES | 11812 | 1 | 11812 | 19.27% |
| BIG HORN | 10525 | 1 | 10525 | 28.07% |
| WYOMING | 453588 | 31 | 14632 | |

| | | | | |
|---|---|---|---|---|
| TOTALS | 453588 | 31 | | |
| Maximum | 73142 | 4 | 18705 | 29.89% |
| Minimum | 10525 | 1 | 10259 | -27.84% |
| Range | 62617 | 3 | 8446 | 57.73% |
| Average | 26682 | 1.82 | | |

Minimum Controlling Pop = 203,382 people electing 16 senators
(Hypothetical) 44.84% of population; 51.61% of senators

## APPENDIX III

### DECLARATION OF RATIONALE

The state of Wyoming hereby declares that the Wyoming constitution does provide for a fair and rational method of apportionment given the uniqueness of the state in view of the sparseness and distribution of the population over a large geographic area, of its geographical features and its varied social economic and political communities. It is hereby declared that the policy of this state is to preserve the integrity of county boundaries as election districts for the house of representatives and to the maximum extent possible for the senate. The legislature has considered the present population, needs, and other characteristics of each county. The legislature finds that the needs of each county are unique, that county boundaries are accurate representations of the divisions between real social, economic and political communities within the state and the interests of each county must be guaranteed a voice in the legislature. The legislature therefore, will utilize the provisions of Article 3, Section 3 of the Wyoming Constitution as the determining standard in the reapportionment of the Wyoming house of representatives which guarantees each county

at least one (1) representative. The legislature finds that the opportunity for oppression of the people of this state or any of them is greater if any county is deprived a representative in the legislature than if each is guaranteed at least one (1) representative. The legislature finds that the dilution of voting power of other counties resulting from giving Niobrara county its own seat in the house of representatives is de minimis when weighed against the need to maintain the integrity of county boundaries. The legislature has considered a variety of districting plans where districts cross county lines. The legislature finds that preserving the integrity of the county boundaries is necessary to minimize the potential of the gerrymander. The legislature also finds that it is not practical or necessary to increase the size of the legislature beyond the provisions of this act in order to meet its obligations to apportion in accordance with constitutional requirements consistent with this declaration.

House Enrolled Act No. 81 (1991), section 3(a).