**Harold F. RICE, Plaintiff,**

**v.**

**Benjamin J. CAYETANO, Governor of the State of Hawai'i, Defendant.**

**CIV. No. 96–00390 DAE.**

United States District Court,
D. Hawai'i.

May 6, 1997.

David L. Ross, Law Offices of David L. Ross, Los Angeles, CA, John W. Goemans,

Law Offices of John W. Goemans, Kamuela, HI, for Harold Rice.

Winfred K.T. Pong, Deborah Day Emerson, Office of the Attorney General–State of Hawai'i, Honolulu, HI, John P. Dellera, Department of the Attorney General, Honolulu, HI, for Benjamin J. Cayetano.

Winfred K.T. Pong, Deborah Day Emerson, Office of the Attorney General–State of Hawai'i, Honolulu, HI, for Mazie K. Hirono.

*ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT; GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT*

DAVID ALAN EZRA, District Judge.

On February 26, 1997, Plaintiff Harold Rice filed for partial summary judgment on his remaining claim that the voting requirements for elections for the Trustees of the Office of Hawaiian Affairs violate the Constitution and the laws of the United States. On February 28, 1997, Defendant Benjamin Cayetano, Governor of the State of Hawaii, filed for partial summary judgment on the same issue. The court heard argument on these motions on April 28, 1997. John Goemans, Esq., appeared on behalf of Plaintiff; Deputy Attorney General Lynette Matsushima appeared on behalf of Defendant. After reviewing the motions and the supporting and opposing memoranda, the court DENIES Plaintiff's Motion for Partial Summary Judgment and GRANTS Defendant's Motion for Partial Summary Judgment.

### BACKGROUND

Plaintiff Harold Rice ("Plaintiff") brought the instant action challenging his exclusion from voting for the Trustees of the Office of Hawaiian Affairs and from voting in the Special Election ("Native Hawaiian Sovereignty Election") held August 1996. This court has previously addressed Plaintiff's challenge to his exclusion from participating in the Native Hawaiian Sovereignty Election. *Rice v. Cayetano*, 941 F.Supp. 1529 (D.Haw.1996).

The pertinent facts are undisputed. Plaintiff was born and currently lives in Hawaii as a citizen, taxpayer and qualified elector of the United States, the State of Hawaii, and the County of Hawaii. He traces his ancestry to two members of the legislature of the Kingdom of Hawaii, prior to the Revolution of 1893. Plaintiff, however, is Caucasian and is not within the definition of Hawaiian or Native Hawaiian.[1]

The Office of Hawaiian Affairs ("OHA") was established in 1978 by the Constitutional Convention and the voters of Hawaii for the purpose of establishing an office to address the needs of "the aboriginal class of people of Hawaii," as a means to satisfy the State's responsibility under the Admission Act to utilize the public lands trust for the betterment of Native Hawaiians. HRS §§ 10–1, 10–3. OHA is funded partly by legislative appropriations and partly by a pro rata portion of the receipts from the public lands trust created by the Admission Act. HRS §§ 10–13, 10–13.5. OHA is governed by a board of trustees who must be Hawaiian. HRS § 13D–1. Only Hawaiians and Native Hawaiians may participate in the election for the OHA trustees. HRS § 13D–3.

In March 1996, Plaintiff applied to vote in the election for the Trustees of the Office of Hawaiian Affairs. The registration form contained the following declaration: "I am also Hawaiian and desire to register to vote in OHA elections." Plaintiff deleted the phrase "am also Hawaiian and" and marked "yes" on the application. Plaintiff's application was subsequently denied.

Plaintiff now seeks a declaration that this election premises the right to vote upon racial qualifications, and therefore violates the Fourteenth Amendment and the Fifteenth

---

1. Hawaiians are defined as "any descendant of the aboriginal peoples inhabiting the Hawaiian Islands which exercised sovereignty and subsisted in the Hawaiian Islands in 1778, and which peoples thereafter have continued to reside in Hawaii." HRS § 10–2. Native Hawaiians are defined as "any descendant of not less than one-half part of the races inhabiting the Hawaiian Islands previous to 1778, as defined by the Hawaiian Homes Commission Act, 1920, as amended; provided that the term identically refers to the descendants of such blood quantum of such aboriginal peoples which exercised sovereignty and subsisted in the Hawaiian Islands in 1778 and which peoples thereafter continued to reside in Hawaii." *Id.*

Amendment of the United States Constitution.

## STANDARD OF REVIEW

Fed.R.Civ.P. 56(c) provides for summary judgment when:

> ... the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The movant bears the initial burden of "identifying ... those portions of the material on file that it believes demonstrates the absence of any genuine issue of material fact." *T.W.Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). If the movant has met its burden, then "the non-moving party must show that there are 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be in favor of either party.'" *California Architectural Bldg. Prod. v. Franciscan Ceramics*, 818 F.2d 1466, 1468 (9th Cir.1987) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–51, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986)), *cert. denied*, 484 U.S. 1006, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988). When the "evidence" produced by each side conflicts, "the judge must assume the truth of the evidence set forth by the opposing party with respect to that fact." Inferences from the facts, disputed and undisputed alike, must be drawn in the light most favorable to the opposing party. *T.W. Elec.*, 809 F.2d at 631. These genuine factual issues must be supported by significant probative evidence. *Commodity Futures Trading Comm'n v.*

*Savage*, 611 F.2d 270, 282 (9th Cir.1979). Hence, the non-moving party may not stand on its pleadings or merely assert it will controvert the movant's evidence at trial. *See T.W. Elec.*, 809 F.2d at 630. Simple disagreement about a material issue of fact, therefore, no longer precludes the use of summary judgment. *California Architectural Bldg. Prod.*, 818 F.2d at 1468.

## DISCUSSION

Plaintiff and Defendant each move for partial summary judgment on the issue of whether the election for the Board of Trustees of OHA violates the Fourteenth and Fifteenth Amendments by restricting the franchise to those of Hawaiian ancestry.[2]

### I. Restriction on Franchise

Plaintiff argues that the restriction on his right to vote is based purely on racial classifications and is therefore violative of the Fourteenth[3] and Fifteenth[4] Amendments. Plaintiff maintains that Native Hawaiians are a racial rather than political group. Moreover, Plaintiff contends that the United States Supreme Court's decision in *Morton v. Mancari*, 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974) is not controlling because Native Hawaiians are not a recognized Indian tribe.

Defendant, on the other hand, relies heavily upon *Morton* as holding that legislation singling out aboriginal peoples for particularized treatment is evaluated using the rational basis test. Defendant argues that Native Hawaiians have a special relationship to the Federal Government which is similar to the historically unique relationship between mainland American Indian tribes and the Federal Government underlying the *Morton* decision. Consequently, Defendant main-

---

2. Plaintiff's Complaint only challenges the constitutionality of Article XII, § 5 of the State Constitution, (establishing OHA) and § 13D of the Hawaii Revised Statutes (specifying that persons entitled to vote in OHA election be Hawaiian) to the extent that he is excluded from voting. His Complaint does not specifically challenge the requirement that OHA Trustees be Hawaiian nor does it challenge the funding of OHA.

3. The Fourteenth Amendment provides in relevant part that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

4. The Fifteenth Amendment provides in relevant part that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."

tains that although Native Hawaiians are not yet a federally recognized tribe or quasi-sovereign tribal entity, the rational basis test is properly applied to the instant situation because the franchise classification is not racial, but political.

In further support, Defendant notes that the Native Hawaiian community is one marked for rehabilitation and special consideration by Congress, *Ahuna v. Department of Hawaiian Home Lands*, 64 Haw. 327, 336, 640 P.2d 1161 (1982), that the State of Hawaii has a unique obligation to the Native Hawaiian population with fiduciary duties similar to those owed by the federal government to Native Americans, and that the State has a special responsibility to protect traditional rights of access to land for subsistence, cultural and religious purposes. Moreover, Defendant argues that Congress has indicated that Native Hawaiians have a special relationship with the Federal Government paralleling that with Native Americans by grouping Native Hawaiians with Native American groups for various special benefits programs.[5]

Finally, Defendant contends that the rational basis test has been met. Defendant declares that OHA ensures that Native Hawaiians will receive a direct beneficial interest from the public lands as intended by the Admission Act, thereby fulfilling the State's trust obligations and responsibilities to Native Hawaiians. Defendant maintains that limiting the franchise to those OHA's actions directly affected is rationally related to the governmental interest of fulfilling congressionally imposed trust obligations. Defendant additionally asserts that the interests of those disadvantaged by the classification is minimal.

## A. Equal Protection

As a general matter, legislation based upon racial classifications is constitutionally sus-

pect under the Equal Protection Clause and should be reviewed under strict scrutiny. *See Adarand Constructors, Inc. v. Pena*, —— U.S. ——, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). The Supreme Court has held, however, in the context of Native American Indians, that seemingly race-conscious legislation is valid utilizing the less stringent, rational basis test. *Morton v. Mancari*, 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974); *see Washington v. Washington State Commercial Passenger Fishing Vessel Assoc.*, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979) (preferential fishing rights); *Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 99 S.Ct. 2529, 61 L.Ed.2d 153 (1979) (burden of proof in property disputes); *Moe v. Confederated Salish & Kootenai Tribes*, 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976) (immunity from state taxation); *Fisher v. District Court of Sixteenth Judicial Dist.*, 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976) (adoption laws); *Antoine v. Washington*, 420 U.S. 194, 95 S.Ct. 944, 43 L.Ed.2d 129 (1975) (preferential hunting rights).

## B. Morton v. Mancari

In *Morton v. Mancari*, 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974), the Supreme Court held that the employment preference for Indians in the Bureau of Indian Affairs did not constitute invidious racial discrimination, but was reasonable and rationally designed to further Indian self-government. In so holding, the Court recognized that "[r]esolution of the instant issue turns on the unique legal status of Indian tribes under federal law and upon the plenary power of Congress, based on a history of treaties and the assumption of a 'guardian-ward' status, to legislate on behalf of federally recognized Indian tribes." 417 U.S. at 551, 94 S.Ct. at 2483. The "origin and nature of this

---

**5.** Defendant notes the inclusion of Native Hawaiians in the Native American Programs Act of 1974 (42 U.S.C. § 2991 et seq.); the American Indian Religious Freedom Act of 1978 (42 U.S.C. § 1996); the National Museum of the American Indian Act (20 U.S.C. § 80q et seq.); the Native American Graves Protection and Repatriation Act (25 U.S.C. § 3001 et seq.); the National Historic Preservation Act (16 U.S.C. § 470 et

seq.) and the Native American Languages Act (25 U.S.C. § 2901 et seq.) and the promulgation of statutes for the benefit of Native Hawaiians exclusively, including the Native Hawaiian Education Act (20 U.S.C. § 7901 et seq.), the Native Hawaiian Health Care Improvement Act of 1992 (42 U.S.C. § 11701 et seq.), and the Hawaiian Homes Commission Act.

special relationship" derived from the fact that

'in the exercise of war and treaty powers, the United States overcame the Indians and took possession of their lands, sometimes by force, leaving them an uneducated, helpless and dependent people, needing protection against the selfishness of others and their own improvidence. Of necessity the United States assumed the duty of furnishing that protection, and with it the authority to do all that was required to perform that obligation ...'

*Id.* at 552, 94 S.Ct. at 2483 (quoting *Board of County Comm'rs v. Seber,* 318 U.S. 705, 715, 63 S.Ct. 920, 926, 87 L.Ed. 1094 (1943)). The Court then stated that "in this historical and legal context," Congress determined that proper fulfillment of its trust obligation required giving the Indians greater control over their own destinies, leading to the preference provision. *Id.* at 553, 94 S.Ct. at 2484.

Focusing on the fact that the preference provision was "an employment criterion reasonably designed to further the cause of Indian self-government and to make the BIA more responsive to the needs of its constituent groups," and was applied not to Indians as a discrete racial group but as members of quasi-sovereign tribal entities whose lives were governed by the BIA in a unique fashion, the Court concluded that the preference provision was not a "racial preference." *Id.* at 553–54, 94 S.Ct. at 2484. The Court concluded that legislation singling out Indians for special treatment was valid as long as the special treatment could be tied rationally to the fulfillment of Congress' unique obligation toward the Indians. *Id.* at 555, 94 S.Ct. at 2485.

C. Native Hawaiians

Hawaii was an independent kingdom recognized by the United States from 1826 until 1893. Apology Bill, Joint Resolution, Pub.L. No. 103–150, 107 Stat. 1510 (November 23, 1993). In 1893, the monarchy was overthrown and replaced by a Provisional Government (which subsequently declared itself the Republic of Hawaii), which sought annexation to the United States. *Id.* In 1898, by the Newlands Resolution, Congress accepted the cession of the sovereignty of Hawaii and of 1,800,000 acres of lands. *Id.* In 1900, President McKinley signed the Organic Act that provided a government for the Territory of Hawaii and defined the political structure and powers of that government. *Id.*

In 1920, in response to the fact that the number of full-blooded Hawaiians was decreasing and that the race was "fast becoming a minority element" in Hawaii, Congress enacted the Hawaiian Homes Commission Act ("HHCA"). H.R.Rep. No. 839, 66th Cong., 2nd Sess. 2 (1920). The legislative history of the Act, containing testimony from the hearings, describes the Native Hawaiians as "our wards" and the Congress as "trustees." *Id.* at 4; *see Ahuna v. Department of Hawaiian Home Lands,* 64 Haw. 327, 336, 640 P.2d 1161, 1167 (1982). Moreover, testifying before the House Committee, Ex–Secretary of the Interior Franklin Lane described Native Hawaiians as

a most lovable people, a kindly people, and a generous people. They have arts of their own which endear them to the people who visit the islands. It is not altogether the beauty of the islands that attracts people there. It is the spirit that they see and the old civilization that they meet. There is a thriftlessness among those people that is characteristic among peoples that are raised under a communist or feudal system. They do not know what the competitive system is and they will get rid of property that is given them ... Therefore, they should be given as close identification with their country *as is* possible and yet be protected against their own thriftlessness and against the predatory nature of those who wish to take the land from them, and who have in the past.

H.R.Rep. No. 839, 2 *Sess.* at 4. The HHCA set aside certain public lands to be considered Hawaiian home lands to be utilized in the rehabilitation of Native Hawaiians.

In 1959, Hawaii was admitted to the union as the 50th State. Admission Act of March 18, 1959, Pub.L. No. 86–3, 73 Stat. 4 ("Admission Act"). In conjunction with admission, the State of Hawaii made a compact with the

United States to adopt the HHCA as part of its state constitution. *Id.* § 4.

Section 5(b) of the Admission Act granted Hawaii "title to all the public lands and other public property within the boundaries of the State of Hawaii," including the "available lands" set out in the HHCA. *Id.* These lands granted under § 5(b) are to be held as a public trust for the following purposes: for the support of the public schools and other public educational institutions, for the betterment of the conditions of Native Hawaiians, as defined in the HHCA, for the development of farm and home ownership, for the making of public improvements, and for the provision of lands for public use. *Id.* § 5(f).

In accordance with the Admission Act, Hawaii amended its constitution and declared that "[t]he lands granted to the State of Hawaii by section 5(b) of the Admission Act ... excluding therefrom lands defined as available lands' by ... the [HHCA] ... shall be held by the State as a public trust for native Hawaiians and the general public." Haw. Const. art. XII, § 4.

In 1978, the state constitution was amended to create the Office of Hawaiian Affairs, to be funded with 20% of the proceeds from the public trust created under § 5(f) of the Admission Act and legislative allocations. Chapter 10 of the Hawaii Revised Statutes provides the duties and responsibilities of OHA, and Chapter 13 provides that OHA's Board of Trustees be Hawaiians voted on by Hawaiians.

### D. Application

■ The cases following *Morton*[6] repeatedly focus upon the special relationship between the Indians and the federal Government, specifically the Government's "unique obligation" toward Indians. *See County of Oneida v. Oneida Indian Nation,* 470 U.S. 226, 253, 105 S.Ct. 1245, 1261, 84 L.Ed.2d 169 (1985); *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 673 n. 20, 99 S.Ct. 3055, 3068 n. 20, 61 L.Ed.2d 823 (1979); *Washington v. Confederated Bands & Tribes of the Yakima*

*Indian Nation,* 439 U.S. 463, 500–01, 99 S.Ct. 740, 761–62, 58 L.Ed.2d 740 (1979); *Delaware Tribal Business Comm. v. Weeks,* 430 U.S. 73, 85, 97 S.Ct. 911, 919, 51 L.Ed.2d 173 (1977); *Northern Cheyenne Tribe v. Hollowbreast,* 425 U.S. 649, 656, 96 S.Ct. 1793, 1797, 48 L.Ed.2d 274 (1976); *Moe v. Confederated Salish & Kootenai Tribes,* 425 U.S. 463, 480, 96 S.Ct. 1634, 1644–45, 48 L.Ed.2d 96 (1976); *Rupert v. Director, U.S. Fish & Wildlife Serv.,* 957 F.2d 32, 34–35 (1st Cir. 1992); *Peyote Way Church of God, Inc. v. Thornburgh,* 922 F.2d 1210, 1215 (5th Cir. 1991). In *Morton,* the Court stated that the origin of this relationship arises from the fact that the Indians were left helpless and dispossessed due to the United States' exercise of its war and treaty powers. 417 U.S. at 552, 94 S.Ct. at 2483–84.

Notably, almost identical expressions were used by Congress in describing the Native Hawaiians during committee discussion of the HHCA. H.R.Rep. No. 839, 66th Cong., 2nd Sess. 4 (1920); *see Ahuna,* 64 Haw. at 336, 640 P.2d at 1167. Section 5(f) of the Admission Act provides further evidence of this relationship; § 5(f) creates both a federal right enforceable under 42 U.S.C. § 1983, *Keaukaha–Panaewa Community Ass'n v. Hawaiian Homes Commission,* 739 F.2d 1467, 1472 (9th Cir.1984) (*"Keaukaha II"*), and a trust obligation that constitutes a compact with the United States, *id.* *Price v. State of Hawaii,* 764 F.2d 623, 628 (9th Cir. 1985). Further, unlike typical provisions of state law, the trust obligation imposed by § 5(f) is protected from amendment by the state legislature unless the United States has consented to those amendments. Admission Act § 4.

Once Congress has established a trust relationship with an Indian tribe, Congress alone has the right to determine when its guardianship shall cease. *United States v. Nice,* 241 U.S. 591, 598, 36 S.Ct. 696, 697–98, 60 L.Ed. 1192 (1916); *Tiger v. Western Investment Co.,* 221 U.S. 286, 315, 31 S.Ct. 578, 586, 55 L.Ed. 738 (1911); *Joint Tribal Council of Passamaquoddy Tribe v. Morton,* 528

---

**6.** In *Morton* itself, the Supreme Court stated "As long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians, such legislative judgments will not be disturbed." 417 U.S. at 555, 94 S.Ct. at 2485.

F.2d 370, 380 (1st Cir.1975). Despite turning over to the State of Hawaii the lands held for the HHCA and in trust, Congress has not explicitly terminated its trust relationship. *See Keaukaha II*, 739 F.2d at 1472 (though state has responsibility to administer trust under Admission Act, trust obligation is rooted in federal law). The State of Hawaii still must receive Congressional approval for certain amendments to the HHCA. Admission Act § 4.

This court recognizes that Native Hawaiians have not and could not at this time receive formal recognition as an Indian tribe.[7] The court is also acutely aware of the fact that it is the exclusive province of Congress to confer "nationhood" status to the Native Hawaiians. But a careful review of the history of formal recognition supports the conclusion that the fact that Native Hawaiians are not at this time recognized tribes is not controlling for purposes of determining the proper standard of review.

Native Hawaiians were incorporated into the United States twenty years after the treaty making era with Native Americans was finished. 25 U.S.C. § 71; *see* William W. Quinn, *Federal Acknowledgment of American Indian Tribes: The Historical Development of a Legal Concept*, 34 Am. J. Legal Hist. 331, 347 (1990) (hereinafter "Quinn") (definition of acknowledged Indian tribes prior to 1871 was essentially those with treaties). After 1871, Congress and the Bureau of Indian Affairs ("BIA") possessed the power to classify the Indian tribes with no treaty relations. Quinn at 347. It was not until 1934, however, in the Indian Reorganization Act, that the term "recognition" was used in a jurisdictional sense; only Indian tribes that were acknowledged would be provided with services and dealt with in trust relationships. *Id.* Moreover, it was not until the 1970's, after two circuit court cases conditioning important tribal rights on federal acknowledgment, *United States v. Washington*, 520 F.2d 676 (9th Cir.1975), *cert. denied*, 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976) and *Joint Tribal Council of the Passamaquoddy Tribe v. Morton*, 528 F.2d 370 (1st Cir.1975), that the number of petitions for federal acknowledgment rose dramatically, leading to the Department of Interior's decision to formalize the petition and acknowledgment process.

Throughout this entire process, Native Hawaiians were omitted from the acknowledgment system, perhaps in part because Native Hawaiians had already developed their own trust relationship with the Federal Government as demonstrated by the passage of the HHCA and because Native Hawaiians were not being excluded from beneficial legislation in the same manner as unacknowledged mainland United States Indian tribes.

The inclusion of Native Hawaiians in legislation promulgated primarily for the benefit of Native American Indians[8] and the pro-

---

**7.** As noted in *Rice*, 941 F.Supp. at 1542 n. 16, because the administrative procedures to obtain federal recognition excludes aboriginal peoples outside the continental United States, Native Hawaiians are precluded from applying for federal recognition through the acknowledgment process.

  The court additionally acknowledges that Native Hawaiians could not at this point demonstrate that they constitute an Indian tribe by common law definition first articulated in *Montoya v. United States*, 180 U.S. 261, 266, 36 Ct.Cl. 577, 21 S.Ct. 358, 359–60, 45 L.Ed. 521 (1901). Under *Montoya*, a native group has proved sovereign tribal status if it establishes by a preponderance of the evidence that (1) it is a group of Indians of the same or similar race, (2) the group is united in a community, (3) the group is under one leadership or government, and (4) the group inhabits an area of some reasonable definition. *Id.* at 266, 21 S.Ct. at 359–60. A native group must also establish that it is the present day successor to the historic sovereign entity which exercised at least minimal government functions. *Native Village of Tyonek v. Puckett*, 957 F.2d 631, 635 (9th Cir.1992).

**8.** Native American Programs Act of 1974 (42 U.S.C. § 2991 et seq.); American Indian Religious Freedom Act of 1978 (42 U.S.C. § 1996); National Museum of the American Indian Act (20 U.S.C. § 80q et seq.); Native American Graves Protection and Repatriation Act (25 U.S.C. § 3001 et seq.); National Historic Preservation Act (16 U.S.C. § 470 et seq.); the Native American Languages Act (25 U.S.C. § 2901 et seq.); the Indian Health Care Amendments of 1988 (25 U.S.C. § 1601 et seq.); 15 U.S.C. § 637a (Aid to Small Business); 20 U.S.C. § 1106b (Teacher Corps preferences); 38 U.S.C. § 3761 et seq. (Native American Veteran Housing Loan Pilot Program); 42 U.S.C. § 3011 (establishing Office for American Indian, Alaska Native, and Native Hawaiian Programs on Aging).

mulgation of legislation solely for the benefit of Native Hawaiians [9] constitutes further compelling evidence of the continuing guardian-ward relationship between Native Hawaiians and the Federal Government. *See Heckman v. United States*, 224 U.S. 413, 32 S.Ct. 424, 56 L.Ed. 820 (1912) (holding when the federal government enters into a treaty or enacts a statute on behalf of an Indian tribe, Government commits itself to a guardian ward relationship with that tribe); *United States v. Kagama*, 118 U.S. 375, 6 S.Ct. 1109, 30 L.Ed. 228 (1886) (same); *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832) (same).

The *Morton* decision is premised upon the existence of a guardian-ward relationship, and the requirement that the indigenous people be part of a recognized tribe is important as evidence of this continuing relationship. *See Peyote Way Church*, 922 F.2d at 1215 ("[O]nly the constituencies of the quasi-sovereign nations over whom the federal government considers itself guardian enjoy the preference."). As discussed above, there is abundant evidence that the guardian-ward relationship existed, and currently exists, between the federal Government and Native Hawaiians and between the State of Hawaii and Native Hawaiians. As it is the unique guardian-ward relationship that is paramount, not formal recognition, the court finds that *Morton* is equally applicable to Native Hawaiians as to formally recognized Native Americans. *See Ahuna v. Department of Hawaiian Home Lands*, 64 Haw. 327, 339, 640 P.2d 1161 (1982) ("Essentially, we are dealing with relationships between the government and aboriginal people. Reason thus dictates that we draw the analogy between native Hawaiian homesteaders and other native Americans."); *see also Naliielua v. Hawaii*, 795 F.Supp. 1009, 1012–13 (D.Haw. 1990) ("Native Hawaiians are people indigenous to the State of Hawaii, just as American Indians are indigenous to the mainland United States.").

The court concludes that the requirements of the Fourteenth and Fifteenth Amendments are not violated because the restriction on the right to vote is not based upon race, but upon a recognition of the unique status of Native Hawaiians. This classification derives from the trust obligations owed and directed by Congress and the State of Hawaii. Consequently, the legislation will be upheld if it can be tied rationally to the fulfillment of the unique obligation to Native Hawaiians. *Morton*, 417 U.S. at 555, 94 S.Ct. at 2485.

### E. Application of Rational Basis Test

■ Plaintiff argues that there is no rational connection between the State's faithful execution of its trust obligation to Native Hawaiians and the race of electors for OHA. In so arguing, Plaintiff contends that the trust established by the Admission Act is not a trust for Native Hawaiians exclusively because the statute merely lists the "betterment of the condition of native Hawaiians" as a permissible use of the ceded lands. Plaintiff maintains that instead, all the State's residents are beneficiaries of the entire trust. Finally, Plaintiff argues that supporting self-determination or self-government for Native Hawaiians is not a compelling state interest.

Defendant enumerates the following reasons as justification for the franchise restriction: (1) Hawaiians enjoy a unique status as Native Americans or aboriginal peoples and special legislation for them meets equal protection requirements under *Morton*, (2) restriction of the franchise allows Hawaiians greater access to participation in matters directly affecting them, furthering the state's trust obligation toward the betterment of the conditions of Native Hawaiians, reducing the negative impact of having non-Hawaiians administer matters that affect programs and activities relating to Native Hawaiians and Hawaiians, and allowing a board of trustees

---

**9.** Congress has enacted numerous special provisions for the benefit of Native Hawaiians in the areas of health, education, labor, and housing. *See, e.g.*, Native Hawaiian Education Act, 20 U.S.C. § 7901 et seq.; the Native Hawaiian Health Care Improvement Act of 1992, 42 U.S.C. § 11701 et seq.; 20 U.S.C. § 4441 (Program for Native Hawaiian and Alaska Native Culture and Arts); 20 U.S.C. § 7118 (allotting money for drug and violence prevention programs); 42 U.S.C. § 254s (Native Hawaiian Health Scholarship); 42 U.S.C. § 3057 et seq. (Native Hawaiian Health Program).

chosen from among those who are directly interested parties in order to ensure proper management and adherence to the needed fiduciary principles, and (3) ceded lands and their proceeds are held in part for the benefit of Hawaiians.

The court has already discussed the obligations imposed upon the State of Hawaii by Congress in the Admission Act. The lands given to the State by § 5(b) of the Admission Act are held in public trust for five specified purposes. The State of Hawaii, to comply with its obligation to perform one of these five purposes, the betterment of Native Hawaiians, created OHA. OHA is given a 1/5 portion of the proceeds from the § 5(b) lands. OHA has authority to spend this money, as well as money received by legislative allocation and other sources, as it believes will fulfill the purpose. The State of Hawaii limited the electoral franchise to those who are to benefit from OHA's programs. This structure is rationally related to the State's responsibility under the Admission Act to utilize a portion of the proceeds from the § 5(b) lands for the betterment of Native Hawaiians.

Finally, Plaintiff contends that the State of Hawaii may not create a tribe and invest it with powers of self-government. In support, Plaintiff cites *Washington v. Confederated Bands & Tribes of the Yakima Indian Nation*, 439 U.S. 463, 500–01, 99 S.Ct. 740, 761–62, 58 L.Ed.2d 740 (1979), specifically that

> It is settled that the unique legal status of Indian tribes under federal law' permits the Federal Government to enact legislation singling out tribal Indians, legislation that might otherwise be constitutionally offensive. States do not enjoy this same unique relationship with Indians....

Plaintiff, however, has omitted the second half of this clause, where the Court concludes "but Chapter 36 is not simply another state law. It was enacted in response to a federal measure explicitly designed to readjust the allocation of jurisdiction over Indians." *Id.* at 501, 99 S.Ct. at 761. Similarly, the creation of OHA and the pendent legislation providing qualifications for the office of Trustee and for voting were passed pursuant to the Admission Act.

Moreover, the creation of OHA did not create a "tribe" composed of Native Hawaiians, nor is OHA invested with powers of self-government outside of the Act. Moreover, as discussed in detail above, the State of Hawaii created OHA as a means to fulfill the obligation taken over from the federal government as part of the Admission Act. The State of Hawaii did not create the trust relationship with Native Hawaiians, nor did it enact the initial legislation singling Native Hawaiians out for special treatment. Rather, the State of Hawaii merely enacted a reasonable method to satisfy its obligation to utilize a portion of the proceeds from the § 5(b) lands for the betterment of Native Hawaiians. This is clearly consistent with and pursuant to Congress' mandate and intent.

## II. One Person/One Vote

■ Defendant argues further that because OHA was created for a specialized purpose and is vested with very limited governmental authority, the election for the board of trustees of OHA is a "special interest" election within the meaning of *Salyer Land Company v. Tulare Lake Basin Water Storage District*, 410 U.S. 719, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973). Defendant concludes that restricting the franchise to those disproportionately affected by OHA's actions is constitutional because it is rationally related to the State's fulfillment of its unique obligations to Native Hawaiians and Hawaiians.

As discussed above, the limitation on the electoral franchise is not based upon race. The demands of *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), however, do not apply exclusively to restrictions allegedly based upon race. Rather, *Reynolds, Avery v. Midland County*, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968), and *Hadley v. Junior College District*, 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970) require strict adherence to the principle of one-person, one-vote in elections. Even in these cases, the Supreme Court has recognized that "there might be some case in which a State elects certain functionaries whose duties are so far removed from normal governmental activities and so disproportion-

ately affect different groups that a popular election in compliance with *Reynolds* ... might not be required...." *Hadley*, 397 U.S. at 56, 90 S.Ct. at 795.

The Supreme Court found such a case in both *Salyer Land Company v. Tulare Lake Basin Water Storage District*, 410 U.S. 719, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973) and *Ball v. James*, 451 U.S. 355, 101 S.Ct. 1811, 68 L.Ed.2d 150 (1981). In *Salyer*, the Supreme Court upheld a voter qualification statute which restricted voting to landowners and apportioned voting power for directors of the water district upon the assessed valuation of the voting landowner's property. Although the district did exercise some governmental powers, such as the power to hire and fire workers, condemn private property, issue general obligation bonds, and contract for the construction of projects, the Court also noted that this authority was limited because the district's primary purpose was for the acquisition, storage and distribution of water. The Court further recognized that the financial burdens fell on the landowners in proportion to the benefits they received from the district, and that the district's actions therefore disproportionately affected the voting landowners. Based upon these circumstances, the Court applied the rational basis test and concluded that the restrictions were constitutional.

In *Ball*, the Court also upheld the constitutionality of an Arizona method of electing directors for an agricultural improvement and power district which limited voter eligibility to landowners and apportioned voting power based on acreage owned. The Court found that the district did not "exercise the sort of governmental powers that invoke the strict demands of *Reynolds*." *Id.* at 366, 101 S.Ct. at 1818. The Court further described the district's functions as "relatively narrow," noting that the district does not own, sell or buy water, or control the use of the stored water, but instead stores water, conserves it from loss, and delivers it through canals. *Id.* at 367, 101 S.Ct. at 1819. Finally, the Court concluded that the existence and size of the district's power business did not affect the legality of the voting scheme, noting that the provision of electricity is not a traditional element of government sovereignty and that nothing in the prior cases suggests that "the volume of business or the breadth of economic effect of a venture undertaken by a government entity as an incident of its narrow and primary governmental public function can, of its own weight, subject the entity to the one-person, one-vote requirement...." *Id.* at 370, 101 S.Ct. at 1820.

OHA has the statutory purpose to serve as the principal public agency responsible for the performance, development, and coordination of programs and activities relating to Native Hawaiians and Hawaiians, to assess the policies and practices of other agencies impacting on Native Hawaiians and Hawaiians, to conduct advocacy efforts for Native Hawaiians and Hawaiians, to apply for, receive, and disburse grants and donations for Native Hawaiian and Hawaiian programs and services, and to serve as a receptacle for reparations. HRS § 10–3. By statute, OHA is given the following powers: (1) to adopt, amend and repeal bylaws governing the conduct of its business and the performance of its powers and duties; (2) to acquire, to hold, maintain, use, operate, sell, lease any real, personal or mixed, tangible or intangible property in such manner and to the extent necessary to carry out its purpose; (3) to determine the character of and the necessity for its obligations and expenditures; (4) to enter into and perform such contracts, leases, cooperative agreements; (5) to execute all instruments necessary or appropriate in the exercise of its powers; (6) to issue revenue bonds in such principal amounts as may be authorized by law to finance the cost of an office project as authorized by law; (7) to lend or otherwise apply the proceeds of the bonds issued for an office project; (8) to exercise any and all rights provided by law for entry and re-entry upon or to take possession of an office project; and (9) to take such actions as may be necessary or appropriate to carry out the powers conferred by law. HRS § 10–4.

By statute, the Board of Trustees has the power to manage CHA's financial affairs, formulate policy relating to the affairs of Native Hawaiians and Hawaiians, and provide grants and make available technical and

financial assistance for Native Hawaiian and Hawaiian programs. HRS § 10–5. More specifically, Hawaii law specifies that the Board's general duties include developing, implementing and updating a comprehensive master plan for Native Hawaiians and Hawaiians, to assist in the development of state and county plans for Native Hawaiian and Hawaiian programs, to maintain an inventory of available federal, state, county and private programs for Native Hawaiians and Hawaiians, to advise federal, state, and county officials about Native Hawaiian and Hawaiian programs, to conduct research relating to Native Hawaiians and Hawaiians, to develop models for comprehensive Native Hawaiian and Hawaiian programs, to act as a clearinghouse for applications for federal or state assistance to carry out Native Hawaiian or Hawaiian programs, to apply for and administer any federal funds made available for Native Hawaiians and Hawaiians, and to promote and assist the establishment of agencies to serve Native Hawaiians and Hawaiians. HRS § 10–6.

Plaintiff maintains that OHA provides nearly the entire range of social and governmental services provided by the State of Hawaii to all citizens to a select group defined by race. In support, Plaintiff refers to the OHA publication on its Internet site, "Working for the Betterment of a People." In this publication, OHA states that among its programs and services, it helps provide scholarships for students, loans for businesses, and houses for homesteaders, it advocates for Hawaiian water rights and supports legal efforts for Hawaiians to secure title to their land, speaks on behalf of Hawaiians in Congress, the State legislature, and city and county councils, it supports numerous cultural activities, and its health division works with other agencies to ensure that Hawaiian needs and values are taken into consideration when creating health policy.

In *Board of Estimate of City of New York v. Morris*, 489 U.S. 688, 109 S.Ct. 1433, 103 L.Ed.2d 717 (1989), the Supreme Court held that New York City's Board of Estimate fell "comfortably within the category of governmental bodies whose 'powers are general enough and have sufficient im-

pact throughout the district' to require that elections to the body comply with equal protection strictures." Id. at 696, 109 S.Ct. at 1439 (citations omitted). The Board of Estimate possessed fiscal responsibilities including calculating sewer and water rates, tax abatements, property taxes; managed all city property; fixed the salaries of those paid by city funds; and granted all city contracts. *Id.* at 696, 109 S.Ct. at 1439–40. The Court specifically noted that these powers were not shared by any other part of New York City government. *Id.* The Board additionally possessed considerable authority to formulate the City's budget. *Id.*

In *Ball,* the district had the statutory power to establish and enforce laws, rules and regulations to carry on its business, to construct works for irrigation, drainage and power, to levy taxes upon real property within the district, to sell tax-exempt bonds, and to exercise the power of eminent domain. *See Smith v. Salt River Project Agricultural Improvement & Power Dist.*, 109 F.3d 586, 1997 WL 129035 (9th Cir.1997). In determining that the district did not exercise the sort of governmental powers that invoke *Reynolds,* however, the Court noted

> The District cannot impose ad valorem property taxes or sales taxes. It cannot enact any laws governing the conduct of citizens, nor does it administer such normal functions of government as the maintenance of streets, the operation of schools, or sanitation, health, or welfare services. In *Salyer,* we recognized that the powers to contract for and staff projects, to condemn property, and to issue bonds do not amount to such general governmental authority. 410 U.S. at 728 n. 8 [93 S.Ct. at 1230 n. 8]. And as recognized by the dissenting opinion in the companion case to *Salyer,* the power to levy and collect special assessments also does not create such general governmental authority. *Associated Enterprises, Inc. v. Toltec Watershed Improvement Dist.,* 410 U.S. 743, 749 [93 S.Ct. 1237, 1240, 35 L.Ed.2d 675] (1973) (Douglas, J.).

*Ball,* 451 U.S. at 366 & n. 11, 101 S.Ct. at 1818 & n. 11.

Likewise, OHA does not and cannot impose taxes. It cannot enact laws, nor does it administer the normal functions of government. While OHA does participate in a limited way in the operation of schools, health, and welfare services for the specific benefit of Hawaiians and Native Hawaiians, it does not by any means control the provision of these services to the general population. OHA cannot issue bonds, unless specifically authorized by law to finance the cost of an office project as authorized by law. HRS § 10–4. Moreover, while OHA has broad discretion in the disbursement of its funds, it is not unfettered; OHA is carefully constrained by its overall purpose to work for the betterment of Hawaiians.[10]

Under these facts, it is clear that OHA, and correspondingly the Board of Trustees, does not exercise the general governmental powers that invoke the demands of *Reynolds, Avery,* and *Hadley.*

### CONCLUSION

For the reasons stated above, the court concludes that the method of electing OHA Trustees as presently provided by state law meets constitutional standards and therefore, the court DENIES Plaintiff's Motion for Partial Summary Judgment and GRANTS Defendant's Motion for Partial Summary Judgment.

IT IS SO ORDERED.

---

**10.** The Plaintiff makes much of the pronouncements of one or more elected Trustees. The court, however, must base its decision on the specific contours and limits of OHA's mandate and legal authority. To the extent the Trustees of OHA, or even the state legislature exceed these limits, they risk running afoul of federal law and constitutional boundaries. Such action would be subject to immediate challenge in the federal courts.